UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X
JACQUELINE ALSTON; JAQUANA GREEN; LEGIND
GREEN, individually and as Father and Natural Guardian
of L.G., JR. (age 5); and ELIJAH PETERS,

                                Plaintiffs,

        -against-

THE CITY OF NEW YORK; DETECTIVE THIRD-GRADE
RICHARD REILLY, Shield 1475, Brooklyn Narcotics South;
And JOHN and JANE DOES 1-10,

                                Defendants.
---------------------------------------------------------------------------X

19 CV 3978 (AMD) (ST)

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, by their attorney, Joel Berger, Esq., for their first amended complaint allege, upon information and belief, as follows:

### NATURE OF THE ACTION

1. This is an action to recover money damages arising out of the violation of plaintiffs' rights under the Constitution and laws of the United States and the State of New York, including an illegal entry into and search of a dwelling by employees of the New York City Police Department (NYPD).

### JURISDICTION AND VENUE

2. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, and Fourteenth Amendments to the Constitution of the United States.

3. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 and 1343.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b).

### PENDENT JURISDICTION

5. This Court also has jurisdiction over plaintiffs' state law claims, pursuant to its

pendent or supplemental jurisdiction as codified in 28 U.S.C. § 1367.

6. On May 2, 2019, within ninety days after the claims alleged in this complaint arose, a verified Notice of Claim was duly served upon the Comptroller of the City of New York pursuant to § 50-e of the General Municipal Law.  GML § 50-H hearings were conducted with respect to plaintiffs Jacqueline Alston, Legind Green, Legind Green, Jr., and Elijah Peters on July 9, 2019, and with respect to plaintiff Jaquana Green on December 23, 2019.

7. At least thirty days have elapsed since the service of the Notice of Claim, and adjustment or payment of the claims has been neglected or refused by defendant City of New York.

8. This action was commenced within one year and ninety days after the happening of the events upon which the claims are based.

### *JURY DEMAND*

9. Plaintiffs demand trial by jury in this action.

### *PARTIES*

10. Plaintiffs are all African-Americans, citizens of the United States and residents of the State of New York.

11. Jacqueline Alston, age 54, is lessee and resident of the Brooklyn dwelling where the NYPD raid that is the subject of this lawsuit took place: 272 Wyckoff Street, Apartment 15B, Brooklyn, NY 11217 -- a building in the Wyckoff Gardens Houses, a project of the New York City Housing Authority (NYCHA).

12. Jaquana Green, age 22, is a daughter of Jacqueline Alston.  She also is lessee and resident of the apartment where the NYPD raid that is the subject of this lawsuit took place.

13. Legind Green, age 27, is a son of Jacqueline Alston.  He also is a resident of the

2

apartment where the NYPD raid that is the subject of this lawsuit took place.

14. Legind Green brings this lawsuit both individually and as Father and Natural Guardian of his son, L.G., Jr., age 5, who frequently resides in and was present in the apartment when the NYPD raid that is the subject of this lawsuit took place. He was age 4 on the date of the raid.

15. Elijah Peters, age 23, is a friend of Jaquana Green who was present in the apartment when the NYPD raid that is the subject of this lawsuit took place

16. Plaintiffs Jacqueline Alston, Jaquana Green, Legind Green and Elijah Peters are all gainfully employed. Plaintiff Jaquana Green recently graduated from the State University of New York (SUNY) at Oswego, N.Y. and is pursuing a Master's degree in education while teaching sixth grade at a Charter School in Brooklyn.

17. None of the plaintiffs has ever been convicted of any criminal offense.

18. Defendant City of New York is a municipal corporation organized under the laws of the State of New York.

19. Defendant City of New York operates the NYPD, a department or agency of defendant City of New York responsible for the appointment, training, supervision, promotion and discipline of police officers, detectives and supervisory police officers.

20. At all times relevant herein, defendant Richard Reilly was a NYPD Detective Third-Grade, Shield 1475, assigned to Brooklyn Narcotics South.

21. Reilly is the officer who secured a search warrant for the raid and was in charge of the raid.

22. At all times relevant herein, John and Jane Does 1-10 were NYPD officers,

detectives, or supervisors who authorized, ordered, participated in or were otherwise involved pre-execution planning and/or execution and/or post-execution critique of the raid.

23. At all times relevant herein, defendants Richard Reilly and John and Jane Does 1-10 were acting as agents, servants and employees of defendant City of New York and the NYPD.

24. At all times relevant herein, all defendants were all acting under color of state law.

## FACTS

### A. THE RAID ON PLAINTIFFS' DWELLING

25. On April 27, 2019, a Saturday morning, defendants broke through the door of the dwelling at 272 Wyckoff Street, Apartment 15B, Brooklyn, New York.

26. Defendants broke through the door prior to 6:00 A.M., at approximately 5:30 A.M.

27. Defendants did not knock or identify themselves before breaking into the dwelling.

28. The officers had firearms drawn and pointed directly at plaintiffs as they broke through the door of the dwelling.

29. Approximately 10 officers, most of whom are Caucasian, participated in the raid.

30. Upon breaking into the dwelling the officers ordered all of the adult plaintiffs to "get on the fucking ground" and "shut the fuck up," or words to that effect.

31. All of the plaintiffs had been asleep in bed and were naked or semi-naked, in various states of undress or nightclothes, when the police broke into their dwelling.

32. All the adult plaintiffs were handcuffed by the police officers shortly after the officers' forced entry into the dwelling.

33. The police officers searched the apartment extensively between approximately 5:30 A.M. and 9:30 A.M.

34. The officers harmed and destroyed plaintiffs' property during the search and left the dwelling in great disarray.

35. The adult plaintiffs remained handcuffed throughout the entire episode.

36. No arrests were made.

37. No contraband sought by the officers as justification for the raid was recovered.

38. The only alleged contraband found was an item that the police claimed was a tobacco "grinder" belonging to plaintiff Elijah Peters.

   (i) Mr. Peters was issued a summons by defendant Reilly for unlawful possession of marijuana, which under New York State Penal Law § 221.05 is "a violation punishable only by a fine of not more than one hundred dollars" for a first-time offender.

   (ii) Mr. Peters denies that the grinder contained any marijuana, as the item is used to grind tobacco and other lawful substances.

   (iii) Reilly's supporting deposition and summons report reflect that the grinder was never tested for marijuana (DEF 031, 207).

   (iv) Reilly also claimed on a property clerk invoice to have recovered a plastic bottle with marijuana residue from Mr. Peters, but Reilly never charged Mr. Peters with any offense regarding the bottle (DEF 033, 268).

   (v) Reilly never submitted anything to the District Attorney's Office of Kings County in support of the summons, not even the grinder or the property voucher describing it, and that Office maintains that it has no file on the case (emails from defense counsel to plaintiffs' counsel, Dec, 11 & 24, 2019).

5

(vi) On the return date of the summons – July 2, 2019 – in the Red Hook Community Court, the charge was dismissed on motion of the prosecution.

(vii) The dismissal was not an Adjournment in Contemplation of Dismissal (CPL §§ 170.55 or 170.56) but rather an unconditional dismissal on the merits.

39. The search warrant upon which the raid was based makes no mention of marijuana (DEF 008-010, 264-266).

40. Despite the facts that no arrests were made, no contraband sought by the warrant was recovered, and the only alleged contraband recovered was a tobacco grinder that was never tested for marijuana, as to which Reilly submitted no supporting documentation to the District Attorney's Office, and the summons issued by Reilly was dismissed on motion of the prosecution, Reilly signed and submitted several NYPD forms falsely stating that the result of the execution of the search warrant had been "positive" (DEF 216, 227).

41. Detective Reilly also took from Mr. Peters's jacket pocket a federal tax refund check to Mr. Peters for $117.

42. A property clerk invoice issued by Reilly explicitly admits that he seized a white item of mail from Mr. Peters (DEF 171, 267).

43. The tax refund check has not been returned to Mr. Peters.

44. Mr. Peters had ID and the check was not necessary for identification.

### B. THE APPLICATION FOR THE "NO-KNOCK" WARRANT

45. Reilly's sworn affidavit in support of issuance of a "no-knock" warrant for plaintiffs' dwelling, submitted on April 25, 2019, states that the sole target of the raid is an individual named

JD Yung-Staccs (DEF 257-263).

46. Reilly's affidavit alleges that on two occasions a Confidential Informant (CI) supervised by an NYPD Sgt. Gatto had made a "controlled buy" -- a purchase of small quantities of cocaine in plastic twists -- from JD Yung-Staccs, who on each occasion answered the door to Apartment 15B of 272 Wyckoff Street.

47. Reilly's affidavit does not state that JD Yung-Staccs actually lives in apartment 15B of 272 Wyckoff Street.

48. Reilly's affidavit fails to mention that on a previous occasion only four months before the raid, in December 2018, the CI reported that JD Yung-Staccs lived on the 8th floor of 272 Wyckoff Street, not the 15th floor, and had sold the CI a single twist of cocaine from that 8th floor apartment.

49. Reilly deliberately or recklessly withheld from the warrant–issuing judge the information in the report of the 8th floor controlled buy (DEF 229), which states in relevant part as follows:

> DT3 Reilly conducted a search of the CI for contraband and USC, negative results. CI was then handed 20.00 USC by DT3 Reilly and instructed to go to 272 Wyckoff St 15B. CI exited the vehicle at a predetermined location and made their way to the location on foot. DT3 observed CI enter the location. CI walked into the building and went to the ***8th floor to JD Yung-Staccs apartment*** [emphasis added]. CI knocked on JD Yung-Staccs door and exchanged 20.00 USC for 1 plastic twist containing crack cocaine. CI left the location and was observed by the undersigned leaving the location. CI then returned to the field team at [redacted] hours and informed them of the positive buy

50. Neither Reilly nor any other police official has offered any explanation or excuse as to the significance of the CI's report that the target of the raid at issue in this case actually lives on the

7

8th floor of plaintiff's building, not the 15th floor.

(i) The above-quoted CI's report (DEF 229) first surfaced in a discovery response from the City dated November 8, 2019, and was filed with the Court by plaintiffs as an exhibit to their motion of November 18, 2019 to compel discovery (Dkt. Doc. 18-1).

(ii) Although plaintiffs have called it to the Court's attention on two additional occasions since then -- submissions to Judge Donnelly in opposition to the City's effort to dismiss the original complaint (Dkt. Doc. 24, Dec. 9, 2019, p.2; Dkt. Doc. 30, Jan. 30, 2020, p. 2) -- neither Reilly nor any other police official has ever offered any explanation or excuse as to its significance.

(iii) In a letter to Magistrate Judge Tiscione dated February 4, 2020 (Dkt. Doc. 34) defense counsel asserted for the first time that the reference to the 8th floor must be an "error," but proffered no documentation or statement from Reilly or any other police official in support of that assertion, and did not explain how any such "error" could have come about or how the number "8" could have been a mistake for the number "15."

51. In both (i) the controlled buys allegedly occurring on the 15th floor referenced in Reilly's affidavit to the warrant-issuing magistrate, and (ii) the controlled buy occurring on the 8th floor that Reilly withheld from the warrant-issuing magistrate, no police officer actually observed which apartment or even which floor the CI went to – only that the CI entered the building without drugs and with US currency, and returned with cocaine twists and without the US currency.

52. Reilly's affidavit to the warrant-issuing magistrate makes no mention of plaintiffs Jacqueline Alston and Jaquana Green, even though he knew from a NYCHA Report dated the day before he applied for the "no-knock" warrant (Dkt. Doc. 38, Ex. B) that a Jacqueline Alston DOB

1/1/65 was the head of the household and that a Jaquana "Alston" DOB 1/21/97 was also listed as living there.

53. Reilly's affidavit to the warrant-issuing judge states that he and a supervisor conducted a reconnaissance of Apartment 15B two days before applying for the "no-knock" warrant, but makes no mention of the fact that neither he nor any other police officer had ever observed anyone engaging in any illegal activity at apartment 15B of 272 Wyckoff Street.

54. Reilly's affidavit to the warrant-issuing judge does not mention that residents Jacqueline Alston, Jaquana Green and Legind Green lived in apartment 15B of 272 Wyckoff Street, had no criminal convictions of any kind and were all gainfully employed.

55. Reilly's affidavit claims that the CI referenced in his affidavit in support of issuance of the search warrant is a "former user of narcotics," but does not contain any information about the CI's criminal record.

56. Reilly's affidavit does not state anything about the CI's relationship with JD Yung-Staccs, including, but not limited to, how the CI allegedly knew JD Yung-Staccs or how the CI allegedly knew where JD Yung-Staccs lived.

57. Reilly's affidavit of April 25, 2019 to the magistrate who issued the "no-knock" warrant states that the CI has a "proven history of reliability" but cites only four occasions, all very recent -- on in February 2019, two in March 2019 and one in April 2019 -- on which the CI's information allegedly resulted in recovery of contraband and arrests.

58. Reilly's affidavit does not state how long the CI has been a CI, and how many searches or what percentage of searches based upon his information have -- as in this case -- failed to

produce any contraband sought by the search or any arrests.

### C. AFTERMATH OF THE RAID

59. Before departing plaintiffs' premises the officers informed plaintiffs that the target of the raid was an individual named Young Stacks.

60. None of the plaintiffs know this person or know of him or know anything about him.

61. The individual identified as Young Stacks is a person with whom plaintiffs have no connection whatsoever.

62. The individual identified as Young Stacks does not live in 272 Wyckoff Street, Apartment 15B.

63. The individual identified as Young Stacks is not one of the lessees of 272 Wyckoff Street, Apartment 15B.

64. The individual identified as Young Stacks has never visited Apartment 15B of 272 Wyckoff Street.

65. Defendants knew, or should have known had they engaged in even the most rudimentary inquiry required by the Constitution of the United States, the Constitution of the State of New York, and numerous NYPD regulations, that the only residents of Apartment 15B of 272 Wyckoff Street, were Jacqueline Alston, her daughter Jaquana Green, her son Legind Green and Legind Green's son L.G. Jr.

66. Defendants knew, or should have known had they engaged in even the most rudimentary inquiry required by the Constitution of the United States, the Constitution of the State of New York, and numerous NYPD regulations, that none of the residents or Mr. Peters had ever been

10

observed by any law enforcement officers to have engaged in any illegal conduct justifying the raid, that none of them had any criminal records or any outstanding warrants, and that they were all gainfully employed.

67. Toward the end of the incident plaintiffs observed officers taking down the identification of all of the residents and asking for documents establishing their identifications, establishing that the officers did not know for sure beforehand who actually lived in the dwelling.

68. Toward the end of the episode plaintiff Jacqueline Alston observed officers engaging in communications for the purpose of determining whether any of the plaintiffs had any criminal cases pending or any warrants, again establishing that the officers did not know for sure beforehand who actually lived in the dwelling or anything abut the actual residents.

69. Before departing one or more of the officers apologized and stated words to the effect of "I'm sorry, you guys seem like nice people."

70. Subsequent to the raid the police have alleged that JD Yung-Staccs is actually Randall Alston, a son of Jacqueline Alston.

71. Randall Alston does not live in the raided dwelling, had not lived there for more than a year prior to the raid, and in fact lives hundreds of miles away from the dwelling in upstate New York.

72. Reilly's affidavit in support of the warrant, and his allegations in that affidavit as to the CI's assertions, make no mention of whatsoever of Randall Alston, even though the NYCHA Report Reilly obtained the day before applying for the "no-knock" warrant reflected outdated information that a Randall Alston was still living there (Dkt. Doc. 38, Ex. B).  The NYCHA

document in question does not state that anyone named JD Yung-Staccs lives in the apartment.

73. Reilly's affidavit in support of the warrant does not claim that JD Yung-Staccs is actually Randall Alston or that the CI had claimed that JD Yung-Staccs is actually Randall Alston.

74. Reilly's affidavit in support of the warrant and does not seek a warrant for "JD Yung-Staccs a/k/a Randall Alston," or "Randall Alston a/k/a JD Yung-Staccs," or "Randall Alston."

75. Defendants' "Randall Alston" defense is of no consequence because the Second Circuit has explicitly held (*McColley v. County of Rensselaer,* 740 F.3d 817, 826 n. 3 (2d Cir. 2014)) that after-the-fact claims by law enforcement -- as opposed to "the contemporaneous materials" submitted by the CI and "the contemporaneous materials" presented by the police to the magistrate who issued the "no-knock" search warrant -- are not to be credited in a court's resolution of a case.

76. When the officers asked plaintiffs in the aftermath of the raid if they knew anyone named Yung-Staccs, they did not ask plaintiffs anything about Randall Alston or his whereabouts.

77. A NYSID report obtained by the NYPD after the raid reflects that Randall Alston has never been convicted of any offense (DEF 174-176).

78. The NYSID report obtained after the raid also reflects that Randall Alston's weight is 170 pounds (DEF 174), whereas Reilly's affidavit in support of the warrant describes JD Yung-Staccs weight as 190 pounds (DEF 259) and the CI's reports alleging purchases of cocaine twists from JD Yung-Staccs on either the 8th or 15th floor of 272 Wyckoff Street state that JD Yung Staccs's weight is 190 or 200 pounds.

79. In light of the facts that (i) no arrests were made, (ii) no contraband sought by the officers as justification for the raid was recovered and (iii) Reilly's application for the search

12

warrant deliberately or recklessly withheld important information from the warrant-issuing magistrate, the raid violated plaintiffs' rights secured by the Constitution of the United States and the Constitution of the State of New York.

80. In light of the fact that the raid produced no arrests and no recovery of contraband sought by the search warrant, as well as the discrepancy in the CI's reports as to whether the target of the raid lived on the 8th floor or the 15th floor of plaintiffs' building, there is substantial grounds for belief that the allegations of the CI on whose word the warrant was sought, and the CI himself or herself, were grossly unreliable.

81. Despite the CI's previous claims that JD Yung-Staccs lives on the 8th floor of 272 Wyckoff Street, not the 15th floor (DEF 229), the police have produced no discovery reflecting that they engaged in any significant inquiry to verify the reliability of the CI and the CI's allegations that in April 2019 he had purchased cocaine from JD Yung-Staccs in apartment 15 B of 272 Wyckoff Street, and instead simply took his word for it in seeking a search warrant for apartment 15B.

82. Defendants in this case are not shielded from liability, because when a "no-knock" search warrant is obtained by deliberately or recklessly withholding relevant information from the issuing magistrate, such as information indicating the unreliability of the CI and the CI's allegations, or information indicating the absence of any significant inquiry by the police verifying the reliability of the CI and the CI's allegations, and the withheld information may have been relevant to the finding of probable cause for issuance of the warrant, qualified immunity is unavailable. *McColley v. County of Rensselaer,* 740 F.3d 817, 823-824 (2d Cir. 2014), and numerous cases cited therein.

83. In *McColley*, a case remarkably similar to the instant case, the Second Circuit's

affirmance of the district court's rejection of defendants' qualified immunity claim on a summary judgment motion rested entirely upon what the police told -- and did not tell -- the magistrate who was persuaded to sign the "no-knock" warrant. The police told the magistrate that the CI claimed to have purchased drugs from drug dealers in Ms. McColley's dwelling and that the CI had a history of accuracy and reliability. But they failed to mention that Ms. McColley was a gainfully employed single mother, who lived with her young daughter and had no criminal history, and that despite police surveillance of the dwelling there was no evidence alleging that she had engaged in any illegal conduct. The police never mentioned McColley's identity and lack of criminal record or activity to the magistrate, and never even mentioned that there was a resident who lived at the dwelling -- as opposed to it allegedly being a place for drug dealing by others. 740 F.3d at 820-822. That is precisely what happened in this case. These omissions undermined the informant's reliability and the reliability of the information presented to the warrant-issuing magistrate, and courts must look to the "totality of circumstances" underlying the assessment of probable cause rather than assuming the existence of probable cause simply because the police assert that the CI had been "proven reliable in the past." 740 F.3d at 826. And the totality of circumstances in *McColley*, although held by the Second Circuit to favor the plaintiff, did not include the additional fact -- present in this case and unexplained by the police -- that the CI had on a recent prior occasion reported to the police that the drug seller lived somewhere other than plaintiffs' dwelling.

84. The "no-knock" warrant in this case was obtained and executed in violation of numerous guidelines and requirements issued by the Police Commissioner in the wake of the death of Ms. Alberta Spruill during a raid in Harlem in May 2003, including, but not limited to:

(i)        the pre-execution investigation and documentation required by NYPD Patrol Guide (PG) 212-75, including, but not limited to, investigation and documentation into who lives in the dwelling, and whether any of the residents have any criminal records or outstanding warrants;

(ii)       the Search Warrant Execution guidelines (PG 221-17);

(iii)      the Confidential Informants Guidelines (PG 212-68);

(iv)      the Formal Post-Execution Critique (PG 212-106) that must be prepared by the Commanding Officer who supervised execution of the warrant and the review of that Critique by overhead command -- especially important in cases where execution of a search warrant produces no contraband sought by the officers as justification for the raid and no arrests whatsoever;

(v)       Commissioner Kelly's report to the Mayor on the *Spruill* case (May 30, 2003) at 8, 9, 10, 12 and 20, which in turn quotes Chief of Patrol Estavillo's memorandum of October 23, 2002 (Memorandum Number 567s.02); and

(vi)      Commissioner Kelly's testimony before the New York City Council Committee on Public Safety (June 4, 2003) at 41, 48, 88-89, stating, *inter alia*, that "most confidential informants are criminals," that accordingly a supervisor "must conduct observations of the specific location in order to confirm and validate the CI's information," and that "you need more information, more observations on the part of Police Department personnel, not just the word of a confidential informant, to allow us to go forward in the execution of warrants."

85. Defendants' failure to comply with the above-referenced NYPD rules and regulations is relevant to plaintiffs' allegations of defendants' disregard for plaintiffs' rights under the Constitution of the United States and the Constitution of the State of New York, and is direct evidence in support of plaintiffs' pendent state law claims of negligence by defendants.

86. Defendants ignored plaintiffs' numerous requests to be shown a copy of any search warrant, in violation of NYPD regulations.

87. Patrol Guide PG 221-17 ¶ 23 commands NYPD officers executing a search warrant to "[s]how a copy of the search warrant, upon request, safety permitting."

88. Since the premises of the raid had been secured and all adult plaintiffs had been handcuffed, there were no safety considerations justifying the officers' failure to show plaintiffs a copy of any warrant, as required by the NYPD Patrol Guide.

89. In addition to falsely reporting to his supervisors that the outcome of the raid was "positive" (DEF 216, 227), Reilly swore out a false and misleading Return on the warrant which he filed with the Court that had issued it (DEF 267).

(i) Although Reilly was required by law to file the Return within 10 days of the April 27, 2019, execution of the raid, *i.e.*, by May 7, 2019, he delayed submitting it for anther nine days, until May 16, 2019.

(ii) The Return swears that plaintiffs Jacqueline Alston, Jaquana Green and Legind Green were arrested, without mentioning that they were only detained in their apartment for the duration of the raid, and were never charged with the commission of any offense, and that voided arrest forms were prepared for each of them stating that each "was found not to have committed a

16

crime" (DEF 011, 014, 017),

(iii) The Return swears that marijuana was recovered during the raid, without mentioning that (a) the alleged marijuana was only a residue on a tobacco grinder; (b) it belonged to plaintiff Peters, a visitor who was not one of the three residents of the premises; (c) it was never tested; (d) no documentation with respect to the summons issued to Peters for the grinder had been forwarded to any prosecutor; (e) although Reilly also recovered from Peters a plastic bottle allegedly having a marijuana residue, Reilly never charged Peters with any offense regarding the bottle and (f) the warrant did not authorize any search for marijuana or even mention marijuana.

### D. IMPACT OF THE RAID UPON PLAINTIFFS

90. The raid has left plaintiffs shattered and frightened.

91. Plaintiffs are fearful that if the police could do this sort of thing to them once it could easily happen again.

92. Plaintiffs are scared that they have no defense against this kind of police intrusion into the sanctity of a dwelling.

93. The infant L.G., age 4 on the date of the raid, was terrified, crying and screaming, and has been traumatized by experiencing such an encounter with the police at such an early age

94. Jacqueline Alston suffered a meniscus tear above her right knee when she was startled by the officers' violent entry into the dwelling.

### FIRST CLAIM FOR RELIEF

95. Plaintiffs repeat and reallege the allegations contained in ¶¶ 1-94.

96. Defendants Reilly and John and Jane Does 1-10, by their conduct toward plaintiffs

alleged herein, violated plaintiffs' rights guaranteed by 42 U.S.C. § 1983, the Fourth, and Fourteenth Amendments to the Constitution of the United States, and Article I, §§ 1, 6, 11 and 12 of the Constitution of the State of New York.

### SECOND CLAIM FOR RELIEF

97.     Plaintiffs repeat and reallege the allegations contained in ¶¶ 1-94 and 96.

98.     The conduct toward plaintiffs alleged herein constituted an illegal entry into and search of a dwelling, false imprisonment, destruction of property, and employee negligence.

99.     The conduct toward plaintiffs alleged herein subjected them to trauma, shock, debasement, fright, fear, humiliation, embarrassment, loss of freedom, harassment, and physical, psychological and emotional injury, trauma, pain, and suffering.

### THIRD CLAIM FOR RELIEF

100.    Plaintiffs repeat and reallege the allegations contained in ¶¶ 1-94, 96, and 98-99.

101.    At all times relevant herein, the individual defendants were on duty and were acting within the scope of their employment as agents, servants and employees of the City of New York, which is therefore responsible for their conduct under common law, state law and Article I, §§ 1, 6, 11 and 12 of the Constitution of the State of New York.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request judgment against defendants as follows:

(a)     Compensatory damages against all defendants, jointly and severally;

(b)     Punitive damages against all individual defendants, jointly and severally;

(c)     Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

(d)     Such other and further relief as this Court deems just and proper.

Dated:   New York, New York
         February 10, 2020

                                        <u>/s/ Joel Berger</u>
                                        **JOEL BERGER**
                                        675 Third Avenue, 8th Fl.
                                        New York, New York 10017
                                        (212) 687-1425

                                        **ATTORNEY FOR PLAINTIFFS**